UNITED STATES OF AMERICA

v.

Elliot NEUFELD, D.O., and Jon
Mickle, Defendants.

No. CR–2–94–144.

United States District Court,
S.D. Ohio,
Eastern Division.

Dec. 17, 1996.

Roger Philip Sugarman, Robert Carl Schuler, Emens Kegler Brown Hill & Ritter, Columbus, OH, James Streicker, Chicago, IL, for Elliott Neufeld, D.O.

Edward E. McNally, Altheimer & Gray, Jeremy D. Margolis, Rita M. Alliss, Altheimer & Gray, Chicago, IL, for Jon Mickle.

David Joseph Bosley, United States Attorney's Office, Columbus, OH, William Bowne, U.S. Department of Justice, Fraud Section, Washington, DC, for U.S.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Defendants Neufeld and Mickle move to dismiss the indictments against them on double jeopardy grounds. The Court declared defendants' first trial a mistrial after the government introduced unfairly prejudicial testimony that the defendants were gay lovers. For the reasons that follow, the Court denies defendants' motion to dismiss.

### I.

The government charges Dr. Elliot Neufeld and Jon Mickle with violations of the Medicare–Medicaid Anti–Kickback statute, 42 U.S.C. § 1320a–7b(b). The Anti–Kickback statute prohibits health care providers from receiving or offering "any remuneration ... for referring" patients to health care services for which Medicare or Medicaid pays. *Id.*

The government alleges that defendant Neufeld conspired with defendant Mickle to establish a series of "consulting agreements" with Caremark, a home infusion company. Under these agreements, Caremark allegedly paid defendant Neufeld for referring his patients to Caremark for health care services. It also alleges that defendant Neufeld referred patients to Caremark while he was working under those consulting agreements and received remuneration for those referrals. Finally, the government alleges that defendant Neufeld violated the federal mail fraud statute, 18 U.S.C. § 1341, 1343 in executing the kickback scheme.

Defendants are gay. Throughout this case defendants have voiced their concern that issues of their sexual orientation and homosexual relationship would inflame the jury, resulting in an unfair trial.

The first grand jury indicted defendant Neufeld in September 1994. The grand jury

indicted defendant Mickle in May 1995. Soon afterwards Mickle moved to dismiss his indictment for selective prosecution. He argued that the government had indicted him because of his homosexual orientation, not because of any alleged conspiracy with defendant Neufeld. The Court denied his motion.

In March 1996, defendants filed a motion in limine to exclude from trial any evidence of homosexual conduct between the defendants, fearing that severe prejudice would result. The government's response acknowledged the defendants concerns and agreed to exercise restraint on the issue of sexual orientation. In response to the defendants' motion, and based on the government's representation, the Court issued a pre-trial order which excluded evidence of specific instances of sexual conduct from trial.

The trial began on September 9, 1996. *Voir dire* lasted more than two days, during which potential anti-homosexual bias was discussed with each juror. Defense counsel vigorously objected to anyone serving on the jury who had any moral objections to homosexuality. Over defendants' objections, the Court declined to dismiss several prospective jurors who said they were morally opposed to homosexual conduct, but who strongly and credibly stated that they could be fair and impartial in this case. The Court told each such prospective juror that the defendants' homosexuality was not an issue in the case, and the government repeatedly asserted that the case was not about homosexuality.[1]

On the first day of testimony, September 16, 1996, the government elicited the following statements from its first witness, Ms. Carolyn Sipes:

Q. [Prosecutor] Were you aware of any special relationship between Elliot Neufeld and Jon Mickle?

A. [Ms. Sipes] Yes, I was.

Q. [Prosecutor] How did you know about it?

A. [Ms. Sipes] Jon told me.

Q. [Prosecutor] What did Jon tell you?

A. [Ms. Sipes] He told me that they had been lovers.

Trial tr. 9/16/96, p. 684, 11.19–25. Defense counsel objected, and the Court overruled the objection. The prosecutor then continued his questions:

Q. [Prosecutor] Did Elliot Neufeld ever mention his relationship with Jon Mickle to you?

A. [Ms. Sipes] Yes, he did

Q. [Prosecutor] What did he say?

. . .

A. [Ms. Sipes] Elliot told me that they had been an item at one time.

Q. [Prosecutor] Did you ever witness any arguments between Elliot Neufeld and Jon Mickle?

A. [Ms. Sipes] Yes, I did.

Q. [Prosecutor] Describe them, please, for the jury.

*Id.* p. 685, 11.4–17. Defense counsel objected again and requested a mistrial.

During the sidebar conference immediately following the testimony and in oral arguments the next day, the Court queried the government about the prejudicial testimony. The prosecutor acknowledged that he had elicited the testimony with the intention of using it as a basis for the government's theory of the case.[2] He argued that evidence

---

1. Defendants did not hide their sexual orientation. Throughout *voir dire*, the Court and counsel informed the prospective jurors that defendants were gay. During their opening statements counsel again openly stated defendants' sexual orientation. Defendants, however, consistently drew a distinction between informing the jury that they were gay, and telling the jury about specific instances of sexual conduct, the latter being clearly inflammatory.

2. The prosecutor explained that he hoped to elicit testimony that would lay the foundation for the government's allegation that, whenever defen-

dant Neufeld did not get what he wanted, he threatened not to refer patients to Caremark:

[T]he answer that I hoped to hear is: Yes, there were arguments because at one time—in fact, there were several instances—but the one in question has to do with the fact that Jon Mickle was dating Mike Federer and at that point Elliot Neufeld said: I am going to refer my patients elsewhere.
It goes directly to his motivation to refer his patients to Caremark.... This goes directly to motive and it is very important because every time Elliot Neufeld asked for something, or

558

that the defendants were gay lovers is not the same as evidence of specific instances of homosexual conduct. He contended, therefore, that the testimony did not violate the Court's pre-trial order. The Court found that the distinction was of little import. The resulting impact on the jury and unfair prejudice were the same as if specific instances of homosexual conduct had been introduced.

The Court found that the introduction of evidence that the defendants were lovers was so unfairly prejudicial that it was necessary to grant the defendants' motion for mistrial. In his explanation to the Court of the reasons for his improper questioning, the prosecutor conceded that he intended to elicit the testimony that the defendants were "lovers."

The defendants now move to dismiss their indictments on the basis that the government introduced the testimony in violation of the Court's pre-trial order in a deliberate attempt to goad the defense into moving for mistrial. They argue that a second trial would thus violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

## II.

 Under the Double Jeopardy Clause of the Fifth Amendment, no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This guarantee encompasses three separate protections. A criminal defendant may not be prosecuted a second time for the same offense after a conviction; he may not be re-prosecuted for the same offense after an acquittal; and he may not be given multiple punishments for the same offense. *Justices of Boston Mun. Court v. Lydon,* 466 U.S. 294, 306–07, 104 S.Ct. 1805, 1812–13, 80 L.Ed.2d 311 (1984) (dictum). Jeopardy attaches as soon as the defendant

is placed "in jeopardy," i.e., when the Court has impaneled and sworn the jury. *Crist v. Bretz,* 437 U.S. 28, 29, 98 S.Ct. 2156, 2157–58, 57 L.Ed.2d 24 (1978).

 Declaration of a mistrial falls squarely within the first two guarantees of the Double Jeopardy Clause, and a defendant cannot be retried after a mistrial unless there is a "manifest necessity" for a new trial. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). When, however, the defendant himself chooses to terminate his first trial by his own motion for mistrial, the government may retry him. *Oregon v. Kennedy,* 456 U.S. 667, 673, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416 (1982) (citing *United States v. Tateo,* 377 U.S. 463, 467, 84 S.Ct. 1587, 1589–90, 12 L.Ed.2d 448 (1964)). *Kennedy* carved out a narrow exception to this rule. It stated that, when a prosecutor acts deliberately to goad the defendant into requesting a mistrial, the Double Jeopardy Clause bars retrial. *Id.*

 In the instant case, defendants contend that the government was on notice that any attempt to introduce the prohibited testimony would inevitably result in a defense motion for mistrial. In support of this contention, the defendants cite particularly: defendant Mickle's motion to dismiss for selective prosecution; defendants' motion in limine for exclusion of testimony concerning homosexual conduct;[3] the supplemental juror questionnaires; *voir dire* which repeatedly highlighted potential anti-homosexual bias;[4] and defendants' reiteration of their sensitivity to potential anti-homosexual bias on the day of trial itself. Defendants argue that the government's intentional elicitation of the prejudicial testimony, given its knowledge of the defendants' sensitivity to the issue, shows

---

every time he got angry, he threatened to refer his patients elsewhere.
Trial Tr. 9/16/96, p. 686 1.5–p. 687 1.7. This, in turn, would support the government's theory that defendant Neufeld referred patients to Caremark only because he expected something in return.

3. The defendants noted that, in its response to their motion in limine, the government agreed "not to elicit testimony regarding specific instances of sexual conduct of the defendants with-

out prior notice to defense and prior ruling by the court." Def. Memorandum in Support of Motion to Dismiss, p. 10 (quoting government's letter, 3/4/96, p. 2).

4. The defendants also point out the prosecutor's repeated acknowledgements during *voir dire* that homosexuality was "not part of this case" and "not at issue in this case." Def. Memorandum in Support, p. 10 (quoting Trial Tr. 9/9/96, p. 183 1.22–p. 184 1.1 and p. 230 11.1–4).

its intention to goad the defendants into requesting a mistrial.

■ These facts do not support an inference of prosecutorial intent to provoke a mistrial. The Sixth Circuit has specifically refused to equate a "deliberate act" with an "intent to goad." *United States v. White,* 914 F.2d 747, 752 (6th Cir.1990). The exception enunciated in *Kennedy* "requires a showing of more than a deliberate act—there must be a showing that the prosecutor's deliberate conduct was intended to provoke the defendant into moving for a mistrial." *Id.* Thus, showing that the prosecutor intended to commit the act itself is not enough. The defendants must show that the prosecutor specifically intended to provoke a mistrial.

The Supreme Court in *Kennedy* noted that the finding of intent calls for the trial court to make an inference from objective facts and circumstances. *Kennedy,* 456 U.S. at 675, 102 S.Ct. at 2089. The Court noted that the finding of intent in the context of the Double Jeopardy Clause is similar to the finding of intent in the criminal justice system. *Id.* The Sixth Circuit, relying on Justice Powell's concurrence in *Kennedy,* has identified factors to guide the court's determination of prosecutorial intent to goad a mistrial. These include a sequence of overreaching prior to the single prejudicial incident, whether the prosecutor resisted or was surprised by the defendant's motion for mistrial, and the trial court's findings concerning prosecutorial intent. *White,* 914 F.2d at 752 (citing *Kennedy,* 456 U.S. at 680, 102 S.Ct. at 2092 (Powell, J., concurring)).

■ These factors—particularly the "sequence of overreaching" inquiry—are of limited help in determining intent here because the mistrial occurred as soon as the trial began. Accordingly, the Court will examine the "totality of the circumstances" to determine the prosecutor's intent. *See United States v. DeAndino,* 958 F.2d 146, 149 (6th Cir.1992) (explaining that general criminal intent is proved by examining the behavior "in the totality of the circumstances").

The requirement of showing that the prosecutor intended to provoke a mistrial presents a high hurdle. Since *Kennedy,* federal courts have consistently refused to infer such prosecutorial intent. *See White,* 914 F.2d at 752; *see also United States v. Perez Sanchez,* 806 F.2d 7, 7–9 (1st Cir.1986) (government witness's reference to excluded evidence deemed good faith mistake), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987); *United States v. Millan,* 17 F.3d 14, 18 (2d Cir.1994) (unintentional failure to disclose police misconduct not an effort to goad mistrial); *Virginia v. Kelly,* 29 F.3d 145, 147 (4th Cir.1994) (failure of prosecutor to produce exculpatory evidence not intended to goad a mistrial); *United States v. Botello,* 991 F.2d 189, 192–93 (5th Cir.1993) (marshal's argument with juror about juror smoking marijuana not an effort to goad a mistrial), *cert. denied,* 510 U.S. 1074, 114 S.Ct. 886, 127 L.Ed.2d 80 (1994); *United States v. Jozwiak,* 954 F.2d 458, 460 (7th Cir.) (neophyte prosecutor's reference during opening statement to codefendants' guilty pleas not an effort to goad a mistrial), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992); *United States v. Ivory,* 29 F.3d 1307, 1310–11 (8th Cir.1994) (accidental *Brady* violation and improper comment during closing argument not intentional provocation); *United States v. Lun,* 944 F.2d 642, 645–46 (9th Cir.1991) (failure to ask witness not to leave country before defense cross-examination not an attempt to goad a mistrial); *Greyson v. Kellam,* 937 F.2d 1409, 1415 (9th Cir.1991) (prosecutor's reference to witness he knew would not testify not intended to goad a mistrial); *United States v. Powell,* 982 F.2d 1422, 1429 (10th Cir.1992) (inquiry into defendant's alleged death threats to witness not an effort to provoke a mistrial), *cert. denied,* 508 U.S. 917, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993).

Only one reported decision—issued before *Kennedy*—has upheld a finding of an "intent to goad." *United States v. Martinez,* 667 F.2d 886, 899–90 (10th Cir.1981), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2301, 73 L.Ed.2d 1304 (1982). In *Martinez,* the government prosecutor admitted that the defendant had been induced into agreeing to a mistrial. The judge and prosecutors had set up the basis for the mistrial request at an ex parte meeting, unknown to the defendant or his attorney. The meeting was held because of

the trial judge's concern that jurors were being intimidated in the courtroom by the behavior of spectators who were sympathetic to the defendant. There, the judge and prosecutors examined various mechanisms by which the defendant might be induced to move for a mistrial. *Id.* at 888.

Although the government eventually requested the mistrial, with the defendant's agreement, the reviewing court determined that, because the defendant had not been notified of the ex parte meeting, he had been led into agreeing to the mistrial without the benefit of all the facts. *Id.* at 888–889. *Martinez* was a pre-*Kennedy* case in which the court employed the more liberal standard of prosecutorial "bad faith conduct ... [which] prods the defendant into requesting a mistrial." The court nonetheless found that the conduct was more than sufficient to bar retrial even if the defendant were required to show that the prosecutor intended to goad him into seeking a mistrial. *Id.* at 890.

*Martinez* is exceptional. It is clearly distinguishable on its facts from the case before this Court. Under circumstances much more similar to those before us in their prejudicial effect, the Eleventh Circuit held that a prosecutor's repeated use of the emotionally-charged term, "organized crime," in his opening statement, in violation of a pre-trial order, was not sufficient to bar retrial. *United States v. Dante,* 739 F.2d 547, 548 (1984). Relying on the trial court's observations of the prosecutor's actions and its evaluation of the reasons proffered by the prosecutor for his conduct, the court of appeals concluded that the necessary intent to provoke a mistrial was absent. *Id.* at 549.

■ The Court reaches the same conclusion here, finding no prosecutorial intent to goad the defendants into requesting a mistrial. Although the government was clearly aware of the sensitivity of the defendants, and this Court, to mention of specific homo-

sexual conduct, it contended that the testimony elicited did not violate the Court's order.

In his explanation to the Court of the reasons for his improper questioning, the prosecutor admitted that he intended to elicit the testimony that the defendants were "lovers." However, he argued a distinction between the testimony given at trial and testimony concerning "specific instances of sexual conduct" precluded by the Court's pre-trial order.[5] The government reiterates this argument in its memorandum in opposition to the defendants' motion to dismiss:

> In this case, government counsel had a good faith belief that evidence of the general nature of defendants' relationship did not violate the court's earlier order concerning "specific instances of sexual conduct" ... [T]he government did not reasonably anticipate that the brief reference to the defendants' relationship would trigger a motion for mistrial.

Government's Mem. in Opposition, p. 15.

Although the Court is not persuaded by the government's argument that its questions were more concerned with "status" than with "conduct," it is nonetheless a colorable stance for the government to have adopted. After reflecting on the matter, the Court held that testimony that the defendants were lovers implicated homosexual conduct. Until that point, however, the government's asserted distinction between evidence of a homosexual relationship and evidence of specific instances of homosexual conduct was not *per se* without merit.

That the government's stance was ultimately found unpersuasive does not render it wholly implausible or an attempt to goad a mistrial. As Justice Powell noted in his concurrence in *Kennedy*, "our system *is* adversarial and vigorous advocacy is encouraged." *Kennedy,* 456 U.S. at 680, 102 S.Ct. at 2092 (Powell, J., concurring) (emphasis in origi-

---

5. The prosecutor argued that "[t]here was no testimony elicited and I would not elicit testimony concerning sexual acts.... There was no question concerning homosexual conduct." Trial Tr. 9/16/96 p. 689 11.21–25. *See also* Trial Tr. 9/17/96 p. 17 11.18–24:

> My understanding of specific instances of sexual conduct are on specific days, specific events

and so forth. And this is the general relationship between these two codefendants who are co-conspirators. It has nothing to do with anything specific, and I am seizing on the word "specific" instances. That was the court order.

nal). Hence, the Court must be cautious in labelling courtroom conduct as an intent "to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 676, 102 S.Ct. at 2089. In the instant case, the Court finds that the circumstances of the incident itself, bolstered by the prosecutor's explanation for his questions, do not support an inference that the prosecutor intended to goad the defendants into requesting a mistrial.

To some extent, the determination of the prosecutor's intent here rests on the Court's evaluation of the credibility of the prosecutor's assertion that he drew a distinction between the fact of defendants' homosexual relationship and specific instances of sexual conduct. Firsthand observation of the prosecutor's conduct and his arguments, taken as a whole, lead the Court to conclude that he acted throughout the proceedings in a manner consistent with his asserted belief that the subject testimony did not violate the Court's pre-trial ruling.

The Court finds the prosecutor's explanation of the basis for his elicitation of the prejudicial testimony to be credible. Even though the distinction he drew was objectively incorrect, it is his actual subjective state of mind that is at issue here. It is clear to this Court that the prosecutor's subjective belief that such a distinction could be drawn belies the defendants' contention that he intended to goad them into moving for a mistrial.

Viewed through the filter of the prosecutor's subjective belief, many of the facts upon which defendants rely to indicate an intent to provoke a mistrial instead become further evidence of the strength of the prosecutor's belief. His actions show considerable consistency.

For example, defendants cite the prosecutor's failure to obtain an advance ruling from the Court on the admissibility of the evidence of a sexual relationship, the testimony he elicited and proposed to elicit, and his failure to urge the Court to adopt measures other than a mistrial to cure the prejudicial effect of his questions. If, however, the prosecutor believed that a valid distinction could be drawn between "relationship" questions and "specific instances" questions, he would not have needed to request an advance ruling,

his questions would not have been improper, and there would have been no prejudicial effect which required curative measures.

■ Defendants correctly note that they need not show the prosecutor's motive to demonstrate an intent to provoke a mistrial. Def. Mem. in Support, p. 6. Nevertheless, motive is often a useful tool for determining intent, and may be part of the totality of the circumstances which should be evaluated. The Court will therefore examine several possible reasons for the prosecutor's alleged intention to provoke a mistrial.

A prosecutor may try to rescue a case that is going badly by goading a mistrial. Such motivation is absent here, however, because the trial had barely begun. As the Seventh Circuit observed in a case in which mistrial was ordered as a result of improper remarks in the prosecutor's opening statement, "Scuttling a trial at dockside poses few if any risks to the defendant's legitimate interests." *Jozwiak,* 954 F.2d at 460. In the instant case, the government had just started the presentation of testimony by its first witnesses when the defense moved for mistrial. At that point, it was much too early to determine whether its case was going well or badly. For these reasons, the motive of rescuing a losing case could not be present in the instant case.

Defendants argue that the prosecutor waited until after the defendants' opening statements to learn the theory of the defense before goading a mistrial. They maintain that the government then provoked a mistrial to gain time to prepare its response to the defense.

The Court finds this assertion implausible. Defense counsels' opening statements consisted largely of denials of the elements the government would have to prove, although the statements were not devoid of theoretical underpinnings. Defendant Mickle's counsel, for example, referred to the government as "rushing to judgment" (Trial Tr. 9/16/96, p. 623 1.3), claimed "improper motive" (*Id.* p. 627, 11.10–14), and intimated that there would "be some surprises" in the trial (*Id.* p. 645 11.14–15). Those surprises were not evident from opening statements, and, in fact,

562

defense counsel admitted that it had "made no secret" of its charges against the government. *Id.* p. 627 1.8.

Although defendants' opening statements were well crafted and adroitly presented, they did not divulge any acutely important information that the prosecution could have exploited only at a later trial with a different jury. The notion that the prosecutor provoked a mistrial to learn the defendants' theory of the case is simply not credible here.

Defendants also contend that the government provoked a mistrial because it needed more time to prepare its case. Although one trial attorney was relatively new to the case, the development of the government's case had already involved several years of investigation and months of trial preparation. The defendants have offered no real evidence that the government was not sufficiently prepared for trial.

In sum, the Court finds insufficient evidence from which to infer that the prosecutor intended to provoke a mistrial when he introduced testimony that the defendants were lovers. Based on its firsthand observation of the prosecutor's conduct and demeanor, the Court finds that the prosecutor elicited the testimony out of an overzealous desire to convict. The prosecutor intentionally decided to begin the government's case with an inflammatory revelation about the defendants. The prosecutor resorted to gratuitous sensationalism to help him win the case, not to goad a mistrial.[6]

For these reasons, the Double Jeopardy Clause of the Fifth Amendment does not bar retrial of defendants Neufeld and Mickle.

### III.

Based on the above, the Court **DENIES** the defendants' motion to dismiss.

The Court fully expects defendants will appeal this ruling, as is their right. If the court of appeals affirms this Court's decision, the Court will set this matter for trial to

begin about four to six months after remand. If this matter is retried, the Court will exclude *all* evidence relating to sexual orientation or conduct, including evidence from which sexual orientation or conduct could reasonably be inferred. The Court would also try defendants separately.

**IT IS SO ORDERED.**

---

**6.** Although the Court is not in the business of evaluating advocacy styles, it must wonder whether such a strategy would really have worked in any event. As a neutral observer, the Court was left wondering whether the government was using the shock value of defendants' relationship to make up for lack of substance. A jury might well have reacted to the subject testimony the same way.