IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 0201-02






EX PARTE JAMES MICHAEL PETERSON, Appellee






ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIFTH COURT OF APPEALS


COLLIN COUNTY






 Per Curiam. Cochran, J., concurs in the judgment. Kealser, J., filed a
dissenting opinion, in which Hervery, J., joined. Hervey, J., filed a dissenting opinion,
in which Keller, P.J., and Keasler, J., joined.


O P I N I O N 


 

 In this case we clarify the standards under which the Texas constitutional double
jeopardy provision, as explained in Bauder v. State, (1) prohibits a retrial after the defense
successfully requests a mistrial. Here, the trial judge granted defendant's motion for
mistrial when the prosecutor asked a question of her first witness that appellant claimed
was improper. The defense then filed a pretrial double jeopardy motion to bar any retrial
which, after a hearing, the trial judge also granted in part. Both the State and the defendant
appealed and the court of appeals affirmed the trial court's ruling. (2) We granted the State's
petition for discretionary review to address two issues: 1) Should the Bauder line of cases
be abandoned? and 2) Did the court of appeals properly apply Bauder to this case? Because
we conclude that the courts below were mistaken in their application of Bauder to this
situation, we need not today address the broader question of whether Bauder and its
progeny should be overruled. (3) We therefore dismiss the State's first ground for review as
improvidently granted. Instead, we clarify the three-pronged analysis by which trial and
appellate courts review Bauder claims, as well as set out a non-exhaustive list of objective
factors for courts to consider when evaluating them.

I.


 James Michael Peterson was charged with two offenses: possession of cocaine with
intent to deliver and possession of cocaine. His attorney filed a discovery motion,
requesting notice of any statements that Peterson made to law enforcement agents and
copies of any recordings. The State agreed to provide both. The prosecutor gave defense
counsel a copy of the written arrest summary which was all that she had at the time of the
discovery request. That summary stated, in part:

 On 02/17/20 [sic], Det. Speaks and other members of the Plano Narcotics
Unit had conducted surveillance on a suspect identified as James M. Peterson
WM 11/13/76. Det. Spears had spoken to Peterson who had informed her
that he had 3.0 grams of cocaine in his possession. Narcotics officers set up
surveillance on Peterson's residence and followed him when he left his
residence in route to Plano.


According to the summary, when those officers saw Peterson commit traffic violations,
they requested other, uniformed, officers to stop him, and "[t]he traffic stop and
conversation with Peterson were video tape[d] and recorded." Peterson consented to a
search of the car, during which the officers found a marijuana pipe, a baggie of marijuana,
and a small suede pouch containing approximately 3 grams of crack cocaine.

 According to the prosecutor's testimony at the habeas corpus hearing, she thought
that there was a video tape of the traffic stop because of the statements in the arrest
summary. She also thought there might be an audio tape of the original conversation
between Officer Spears and Peterson, so she asked her investigator to check "several
places" for tapes. The investigator was told that the videotape had been recycled and no
longer existed. 

 The prosecutor met with Officer Spears a week before the trial and asked about the
existence of any tapes. Officer Spears told her that "she [Officer Spears] could not recall
any such [video] tape, only audiotapes of her conversations." Officer Spears agreed to
check and, on the day of trial, she arrived with audiotapes of the telephone conversations
she had with Mr. Peterson as well as the videotape of the traffic stop. Officer Spears told
the prosecutor that she had kept them in her personal files when she left the narcotics
department about a year and a half earlier. 

 The prosecutor testified that she became aware of the tapes only about half an hour
before the trial started. She immediately told the defense attorney of their existence and
offered to let him view them. (4) He did not want to, nor did he want to say anything to the
trial judge. The prosecutor said:

 I asked him if he wanted to approach the judge and ask the judge to give us
maybe half an hour before the trial commenced to look at them to see if that
would change his position in any way.... and he said that no, at that time he
didn't choose to do that, that we would just go ahead and go through with the
trial and deal with it later.


 The prosecutor then told the defense attorney that she would not use the audio or
video tapes at trial because she had not produced them during discovery. The trial began
and, during her opening statement, the prosecutor told the jury:

 You are going to hear that on February 17th of the year 2000 Rose Spears,
undercover narcotics officer- well, in a time period before this - was in
contact with the defendant, James Michael Peterson. She had been put on
him through a third party, and she had called him to set up a buy of cocaine. 
They had several conversations with regard to its availability, when she
needed it, how much she needed, could he get it for her, and he said that he
could, and they set up a buy.


The defense did not object. 

 The State called Officer Spears as its first witness. She testified that she had been
given appellant's name "and [was] basically introduced over the phone to him by a
confidential informant." The prosecutor then asked: "Did you ever have occasion to
discuss with the defendant an opportunity to purchase cocaine?" At that point, defense
counsel objected, citing his pretrial motion in limine and motion for discovery, and said
that the trial court had ordered the State to turn over any of Peterson's statements. The
prosecutor responded that she did not ask about the content of any statement made by
appellant: "I asked her if she had any opportunity to talk with him about the purchase of
cocaine." The trial court overruled the defense objection, but instructed the prosecutor to
limit her questions to the material in the arrest report summary. (5)

 The prosecutor then continued:

Q: Had you had conversations with the defendant with regard to the purchase of
cocaine?

A: Yes, I did.

Q: And who was - who was to purchase the cocaine?

A: I was to purchase it from him.

Q: Okay. And how did you go about asking him for that?

A: I just asked him if he could get me, I believe it was an eight ball of powdered
cocaine.

Q: And did he agree that he could do that?

A: Yes. He stated he could.


 The defense objected: "Violation of the discovery order." The trial court sustained
the objection, instructed the jury to disregard, and then granted the defendant's request for a
mistrial, (6) telling the prosecutor:

 Well, the Court is going to grant the mistrial, give you another opportunity to
give discovery to the defendant so we can have a full disclosure to the
defense about what you intend to present.


 Mr. Peterson filed a pretrial habeas corpus application that same day and asserted
that any retrial was barred by the Double Jeopardy Clause of the United States and Texas
Constitutions and article 1.10 of the Code of Criminal Procedure. 

 The trial court held a hearing on this motion in which the prosecutor was the only
witness. She outlined her actions and the rationale for them as set out above. She also
agreed with defense counsel that the audio and video tapes significantly added to the
strength of her case and were, when coupled with the other evidence, "pretty damaging." 
She disagreed with defense counsel that the arrest summary did not contain any statements
by Mr. Peterson offering to sell cocaine, although she agreed that this is how the trial court
interpreted that summary. She stated, on cross-examination, that she was not aware that she
was taking any risk that would require a mistrial nor did she think that she had done anything
that was objectionable. Under oath, she denied that she had been aware of, but consciously
disregarded, the risk that an objectionable event for which she was responsible would
require a mistrial at the defendant's request. She testified that she was not attempting to
secure a mistrial and she had no belief that her questions to Officer Spears would cause a
mistrial, especially since the defense had not objected to her opening statement nor to
some of her questions to Officer Spears. She stated that she was perfectly willing to go
forward with the original trial without the video and audiotapes; indeed that had been her
own suggestion to defense counsel, made before jeopardy attached.

 Without explanation, the trial court granted habeas relief on the possession with
intent to deliver count, but denied relief on the simple possession count. Both the defense
and the State appealed. (7) The court of appeals relied upon this Court's decision in Ex parte
Bauder, 974 S.W.2d 729 (Tex. Crim. App. 1998)(Bauder II), and concluded that:

 From this record the trial judge could have concluded appellant's motion [for
mistrial] was not a choice made in response to ordinary reversible error to
avoid conviction, appeal, reversal, and retrial, but was precipitated by the
prosecutor deliberately or recklessly crossing the line between legitimate
adversarial conduct and manifestly improper methods. Furthermore, the trial
judge could have concluded the prosecutor's conduct rendered the trial so
unfair that no judicial admonishment could have cured it. Under these facts
and circumstances, we cannot conclude the trial court erred in granting
appellant habeas relief. (8)


I.


 Both the Double Jeopardy Clauses of the Fifth Amendment and of Art. 1, section 14
of the Texas Constitution "protect a criminal defendant from repeated prosecutions for the
same offense." (9) Although a defendant has a "valued right to have his trial completed by a
particular tribunal," (10) neither constitutional provision guarantees that the State "will
vindicate its societal interest in the enforcement of the criminal laws in one proceeding." (11) 
Thus, double jeopardy principles do not forbid multiple trials of a single criminal charge if
the first trial resulted in a mistrial that: (1) was justified under the manifest necessity
doctrine; (12) or (2) was requested or consented to by the defense, absent prosecutorial 
misconduct which forced the mistrial.

 It is this second prong-a mistrial requested by the defendant who asserts that he was
compelled to do so because of prosecutorial misconduct-that is at issue in the present
case. The underlying principle is that a mistrial which the defense freely chooses to
request does not bar retrial. A mistrial that the defense is compelled to request because of
manifestly improper prosecutorial conduct may, under certain circumstances, bar retrial.

A. Federal double jeopardy principles bar retrial when the prosecutor intended
to goad the defendant into requesting a mistrial.


 The United States Supreme Court has long recognized that even if a mistrial is
consented to or requested by the defendant, double jeopardy will bar a retrial under some
limited circumstances. (13) In United States v. Dinitz, (14) the Supreme Court held that "the
Double Jeopardy Clause does protect a defendant against governmental actions intended to
provoke mistrial requests and thereby to subject defendants to the substantial burdens
imposed by multiple prosecutions." (15) Although that statement seemed relatively clear, the
Court immediately added that the Double Jeopardy Clause "bars retrials where 'bad-faith
conduct by judge or prosecutor... threatens the 'harassment of an accused by successive
prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable
opportunity to convict' the defendant." (16) These two statements created confusion: did
double jeopardy bar retrial only for "government actions intended to provoke mistrial
requests" or also for "bad faith conduct" or "harassment" by the judge or prosecutor?

 In Oregon v. Kennedy, (17) a divided Supreme Court resolved this confusion and held
that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant
into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial
after having succeeded in aborting the first on his own motion." (18)

 In Kennedy, the State charged the defendant with theft of an oriental rug. (19) The
prosecution called an expert on Middle Eastern rugs to testify about the value and identity
of the stolen rug. (20) During cross-examination and in an attempt to establish the witness'
bias, defense counsel asked the expert if he had filed criminal charges against Kennedy. On
redirect, the prosecutor asked the witness to explain why he had filed those charges, but
when the trial court sustained the defendant's objections, the following occurred:

Prosecutor: Have you ever done business with the Kennedys?

Witness: No, I have not.

Prosecutor: Is that because he is a crook? (21)


The trial court immediately granted the defendant's motion for mistrial. Kennedy then
moved to have the charges dismissed based on double jeopardy, but the trial court denied
that motion, finding that the prosecutor did not intend to cause a mistrial. (22) The Oregon
Supreme Court reversed, concluding that, even if the prosecutor had not intended to cause
the mistrial, his actions were motivated by bad faith or to harass or prejudice the
defendant. (23) The Supreme Court, in turn, reversed the Oregon court.

 The Supreme Court rejected its earlier "bad faith" language in Dinitz, and reasoned
that an "intent" test was necessary to have "a manageable standard to apply" in mistrial
situations. (24) This intent standard "merely calls for the [trial] court to make a finding of fact
... using the familiar process in our criminal justice system [of] inferring the existence or
nonexistence of intent from objective facts and circumstances...." (25) The broader "bad faith"
standard, by contrast, would be at issue in virtually every mistrial situation because "[e]very
act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant
by placing before the judge or jury evidence leading to a finding of his guilt." (26)
Furthermore, any test broader than "intent to goad a mistrial" would be counterproductive
because trial judges would be loath to grant legitimate mistrial requests in fear that doing
so would "all but inevitably bring with it an attempt to bar a second trial on grounds of
double jeopardy...." (27) 

 Justice Powell joined the Court's opinion and also wrote separately to underscore
the importance of relying "primarily upon the objective facts and circumstances of the
particular case" in determining the prosecutor's subjective intent, which may often be
unknowable. (28) He noted three objective facts which supported the trial court's conclusion
that the prosecutor did not intend to goad the defendant into a mistrial: 1) the lack of
repetitive misconduct; 2) the prosecutor seemed surprised by the mistrial request and
resisted the defendant's motion; and 3) the trial court believed the prosecutor's testimony
that he had no intent to cause a mistrial. (29)

 Four justices disagreed with the majority's analysis, although they joined in its
judgment. They believed that it should be "sufficient that the court is persuaded that
egregious prosecutorial misconduct has rendered unmeaningful the defendant's choice to
continue or to abort the proceeding." (30) Instead of relying upon the prosecutor's intent,
these justices proposed a two-pronged requirement: (1) "deliberate misconduct" by the
prosecutor; and (2) resulting prejudice that "virtually eliminated, or at least substantially
reduced, the probability of acquittal in a case in which the trial was going badly for [the
prosecutor]." (31) 

 All members of the Supreme Court apparently agreed that, for double jeopardy to
apply, the defense must show that the prosecutor committed "deliberate misconduct" and
that this misconduct had the result (whether specifically intended or not) of seriously
prejudicing a defendant who, absent that misconduct, would likely have a "probability of
acquittal." The Kennedy standard continues to apply to all double jeopardy claims based
upon the federal constitution in the defense-requested mistrial situation.

B. Under Bauder, Texas' double jeopardy provision also bars retrial when the
prosecutor's reckless misconduct requires a mistrial.


 For fourteen years, this Court followed the federal double jeopardy standard set out
in Kennedy. (32) In Bauder v. State (Bauder I), (33) however, this Court held that, although the
double jeopardy concerns in both constitutions were the same, (34) the Kennedy federal
double jeopardy standard did not necessarily provide the outermost limits of a defendant's
rights under the corresponding Texas constitutional provision. (35) Thus, this Court extended
the Kennedy double jeopardy bar to include both those situations in which the prosecutor
specifically intended to goad the defendant into requesting a mistrial, and those in which
"the prosecutor was aware [of] but consciously disregarded the risk that an objectionable
event for which he was responsible would require a mistrial at the defendant's request." (36) 
Thus, either "intent to goad" or "conscious awareness of the risk of a required mistrial"
suffices under Bauder I.

 In Bauder I, this Court based its state constitutional expansion of Kennedy on two
grounds. First, we perceived no constitutionally significant difference between a
prosecutor's conduct by which he intends to cause a mistrial and conduct of which "he is
aware is reasonably certain to result in a mistrial." (37) Second, we perceived practical
advantages of what we said was "a less subjective rule," because it would permit "a more
certain application of the rule in most cases." (38) However, because the Bauder standard
relies upon proof of the prosecutor's "reckless" mental state, and proof of a reckless act is
no less subjective a standard than proof of an intentional act, (39) this second rationale carries
force only if trial and appellate courts focus primarily upon the objective facts and
circumstances of the prosecutor's conduct and the events which led to that conduct. 

 We also emphasized, in Bauder I, that conditions requiring a mistrial "should be
considered very unusual in any adversary system." (40) Prosecutors are entitled to, indeed
expected to, zealously represent the State and to offer "prejudicial" evidence. (41) Thus, even
when a prosecutor offers objectionably and unfairly prejudicial evidence or commits other
errors of judgment, these acts will not suffice to necessitate a mistrial unless they are
"manifestly improper prosecutorial methods." (42) It is only when the prosecutor crosses that
line and uses "manifestly improper prosecutorial methods," either deliberately or
recklessly, that the Double Jeopardy Clause of the Texas Constitution will bar retrial. (43)

 The Bauder I standard has not always proven easy to apply. In our second review of
Mr. Bauder's conviction, Bauder v. State (Bauder II), (44) this Court held that the question of
whether the trial court correctly granted a mistrial request was not the proper focus of a
defendant's state constitutional double jeopardy claim. (45) But both Kennedy and Bauder I
operated from the premise that it is only when the trial court is compelled by the
prosecutorial misconduct to grant a defendant's request for a mistrial, (46) that the defendant
does not himself make a free election. Nonetheless, this Court in Bauder II emphasized
that the critical inquiry is whether the defendant made a free choice to request a mistrial,
rather than being compelled to do so because of the prosecutor's "manifestly improper
methods...deliberately or recklessly" committed. (47)

 Thus, under Bauder II, the proper inquiry is whether the defendant was

 required to move for a mistrial because the prosecutor deliberately or
recklessly crossed 'the line between legitimate adversarial gamesmanship
and manifestly improper methods' that rendered trial before the jury unfair to
such a degree that no judicial admonishment could have cured it[.] (48)


On the other hand, if the defendant's "motion for mistrial was a choice he made in response
to ordinary reversible error in order to avoid conviction, appeal, reversal, and retrial," then
he exercised his free choice in requesting the mistrial and double jeopardy does not bar
retrial. (49) 

 In State v. Lee, (50) this Court declined to abandon the Bauder standard. (51) Instead, we
re-affirmed that it is only when the defendant is required to move for a mistrial "because
the prosecutor deliberately or recklessly crossed 'the line between legitimate adversarial
gamesmanship and manifestly improper methods'... that rendered trial before the jury unfair
to such a degree that no judicial admonishment could have cured it" that the Texas double
jeopardy provision bars a retrial. (52) In Lee, this Court reversed the trial court and court of
appeals which had both held double jeopardy barred a retrial because both lower courts
"failed to take into account the appropriate substantive law when assessing the prosecutor's
mental state." (53) We explained that if the prosecutor has a "legitimate" view of the law (or
of the facts), even if that view is ultimately incorrect, his actions cannot be considered
intentional or reckless misconduct. (54) 

 Thus, under Bauder I, Bauder II, and Lee, the prosecutor's mens rea is pivotal, just
as it is under Kennedy. The only significant difference between the Supreme Court's
decision in Kennedy and the Bauder line of cases is the specific mens rea required to set
up a double jeopardy bar. Under Kennedy, the critical inquiry is whether the prosecutor's
misconduct intended to goad the defendant into requesting a mistrial, and under Bauder and
its progeny, a prosecutor must at least be aware that his manifestly improper misconduct is
likely to result in a mistrial, but he nonetheless consciously ignores that likelihood and
commits the misconduct. 

 In sum, under Kennedy or Bauder and its progeny, trial and appellate courts
analyzing a double jeopardy mistrial claim make the following three-part analysis:


 Did manifestly improper prosecutorial misconduct provoke the mistrial? (55)

 Was the mistrial required because the prejudice produced from that
misconduct could not be cured by an instruction to disregard? (56) And

 Did the prosecutor engage in that conduct with the intent to goad the
defendant into requesting a mistrial (Kennedy standard) or with conscious
disregard for a substantial risk that the trial court would be required to
declare a mistrial (Bauder standard)?


 

 To erect a jeopardy bar, it is not sufficient that the prosecutor's incurably prejudicial
misconduct was the result of inadvertence, sloppiness, or even simple negligence. A
prosecutor's blunder that precipitates a successful motion for mistrial does not bar a
retrial. As we explained in Bauder II, blunders, even manifestly prejudicial blunders, act as
a trigger for a defendant's "free choice" mistrial request because of "ordinary reversible
error" based on prosecutorial misconduct. (57) It is, after all, the right to appeal, not the
double jeopardy clause, that protects defendants from trial error. "The double jeopardy
clause serves not to punish prosecutorial misconduct; it simply ensures that the defendant,
not the government, gets to choose whether to go to verdict." (58)

 The third prong, the prosecutor's intent or recklessness, is the most problematic. 
As noted by Justice Powell in Kennedy, a person's mens rea is frequently difficult to
divine. Intent or recklessness is rarely clear-cut. No one is immune to mistakes or lapses
in judgment. Especially during the "rough and tumble" of a jury trial, courts must expect
that much rule-violating conduct is unplanned, inadvertent, or impulsive. (59) But just as a dog
knows the difference between being kicked and being stumbled over, judges can distinguish
between intentional or reckless misconduct and inadvertent or negligent mistakes. 

C. Under either federal or Texas double jeopardy provisions, the defendant must
prove his claim by a preponderance of the evidence.


 In raising a Kennedy/Bauder double jeopardy claim on a pretrial writ of habeas
corpus, the burden of proof is on the habeas applicant, as it is in any habeas corpus
proceeding. (60) Thus, the defendant must present sufficient evidence to prove his double
jeopardy claim by a preponderance of the evidence. (61) That means that the defendant must
satisfy all three prongs of the analysis set out above. 

 Trial and appellate courts should focus primarily upon the objective facts and
circumstances surrounding the events which led to the mistrial in deciding whether the
prosecutor's alleged misconduct was both manifestly improper and committed with the
requisite intent or recklessness. Although it is not legally required, a trial judge is well-advised to set out his factual findings on the record in support of his ruling on a
Kennedy/Bauder double jeopardy motion. As we recently stated in a different context,
courts should "show their work" (62) so that their ultimate factual and legal conclusions are
clear to the parties and to reviewing courts.

 Some of the objective facts and circumstances that trial and appellate courts might
consider in assessing the prosecutor's mens rea include, but are not limited to:

 1) Was the misconduct a reaction to abort a trial that was "going badly for the
State"? In other words, at the time that the prosecutor acted, did it reasonably
appear that the defendant would likely obtain an acquittal? (63)


 2) Was the misconduct repeated despite admonitions from the trial court?


 3) Did the prosecutor provide a reasonable, "good faith" explanation for the
conduct?


 4) Was the conduct "clearly erroneous"? (64)


 5) Was there a legally or factually plausible basis for the conduct, despite its
ultimate impropriety? (65)


 6) Were the prosecutor's actions leading up to the mistrial consistent with
inadvertence, lack of judgment, or negligence, or were they consistent with
intentional or reckless misconduct? (66)


 In reviewing the trial court's decision, appellate courts review the facts in the light
most favorable to the trial judge's ruling and should uphold it absent an abuse of
discretion. (67) Reviewing courts, including this Court, should "afford almost total deference
to a trial court's determination of the historical facts that the record supports especially
when the trial court's fact findings are based on an evaluation of credibility and
demeanor." (68) We also afford that same level of deference to a trial court's ruling on
"'application of law to fact questions,' also known as 'mixed questions of law and fact,' if
the resolution of those ultimate questions turns on an evaluation of credibility and
demeanor." (69) But appellate courts review de novo those "mixed questions of law and fact"
that do not depend upon credibility and demeanor. (70) Although reviewing courts should
also grant deference to "implicit factual findings" that support the trial court's ultimate
ruling, they cannot do so if they are unable to determine from the record what the trial
court's implied factual findings are.

 III.


 In this case, the trial court did not make any explicit findings of fact, did not
comment on the prosecutor's mens rea, or set out the legal basis for his grant of the
defendant's double jeopardy motion. He granted it without comment or explanation. 

 The court of appeals, left without any guidance from the trial court concerning the
rationale for its ruling, relied upon two isolated pieces of information in the record,
without discussing other facts and evidence in the record which are important under any
Bauder analysis. First, it noted that the trial record showed that "the prosecutor proceeded
to inquire about Spear's conversations with appellant concerning the purchase of narcotics,
despite specific court instructions not to stray from the arrest summary." (71) Second, it
stated that "the prosecutor knew the tapes were 'severely damaging' to appellant and that
admission of the tapes 'would have substantially increased [the State's] chances of securing
a conviction.'" (72) From those two pieces of record information, plus a statement that the
State did not contend that "the state of the law in this case is not well-settled," the court of
appeals held that "the trial judge could have concluded appellant's motion was not a choice
made in response to ordinary reversible error to avoid conviction, appeal, reversal, and
retrial, but was precipitated by the prosecutor deliberately or recklessly crossing the line
between legitimate adversarial conduct and manifestly improper methods." (73) We cannot
agree that this legal conclusion naturally flows from the objective facts and circumstances
in the record. 

 However, because the court of appeals did not have the benefit of the three-prong
analysis that we set out today or the nonexclusive, suggested objective criteria by which to
gauge those three prongs, we vacate the court of appeals' decision and remand the case to
that court for further proceedings consistent with this opinion.


Delivered: October 8, 2003.

Publish.

 
1. 921 S.W.2d 696 (Tex. Crim. App. 1996).
2. Ex parte James Michael Peterson, Nos. 05-01-01093-CR, 05-01-01286-CR, 2001 Tex.
App. LEXIS 8407 (Tex. App. - Dallas 2001) (not designated for publication).
3. See State v. Lee, 15 S.W.3d 921, 922 n.1 (Tex. Crim. App. 2000) (declining to reach
question of whether Bauder should be overruled because it was unnecessary to disposition of case);
see also Watts v. State, 99 S.W.3d 604, 615 (Tex. Crim. App. 2003) (Keasler, J., concurring)
(stating that "appellate courts should strive for prudence.... 'Prudence counsels judges not to reach out
and decide large, controversial issues in the absence of a necessity to do so. The prudent jurist will
typically decide cases on the narrowest, surest ground available, leaving tougher calls, with broader
implications, for future cases that squarely present them.'"). 
4. At that time, the jury members had been selected but not sworn in; thus, jeopardy had not
attached at the time the tapes were produced, at the time the prosecutor told the defense attorney about
them, or at the time the defense declined to review them.
5. The prosecutor explained at the habeas hearing that, based upon the trial judge's ruling, she
thought it was "okay" to talk about that conversation. She said: "I pointed out areas in the discovery
responses which I believe had supported my position that I was able to go into that area. And then the
objection was overruled and I was allowed to proceed if it was based on that, and my belief was
because I had pointed it out in support of my talking about the conversation between Rose Spears and
the defendant with regard to the purchase of narcotics that I was going to be allowed to continue that
line of questioning."
6. When the defense asked for a mistrial, the prosecutor explained that she thought that the
arrest summary put the defendant on notice "that these were the statements that he was making with
regard to the purchase of cocaine....Your Honor, in the context of this where she's contacting him with
regard to that and that he's going to meet her, I think it's clear that...." At that point the trial judge
interrupted and granted the mistrial. 
7. The defense appealed the trial court's denial of his double jeopardy claim on the simple
possession of cocaine count. The court of appeals affirmed the trial court's ruling on this issue.
8. Slip op. at 8 (*12-13) (citations omitted).
9. See Oregon v. Kennedy, 456 U.S. 667, 671 (1982); Bauder v. State, 921 S.W.2d 696,
698 (Tex. Crim. App. 1996).
10. Kennedy, 456 U.S. at 671-72 (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)); see
also Bauder, 921 S.W.2d at 697-98.
11. Kennedy, 456 U.S. at 672.
12. See, e.g., Arizona v. Washington, 434 U.S. 497 (1978); Ex parte Little, 887 S.W.2d 62
(Tex. Crim. App. 1994).
13. See United States v. Jorn, 400 U.S. 470, 483-84 (1971) (plurality op.) (double jeopardy
may bar retrial when the circumstances prompting mistrial are "attributable to prosecutorial or judicial
overreaching").
14. 424 U.S. 600 (1976).
15. United States v. Dinitz, 424 U.S. 600, 611 (1976).
16. Id. (citations omitted).
17. 456 U.S. 667 (1982).
18. Id. at 676. 
19. Id. at 669. 
20. Id.
21. Id.
22. Id. at 669-70.
23. Id. at 670.
24. Id. at 674-75.
25. Id. at 675.
26. Id. at 674.
27. Id. at 676.
28. Id. at 679-80 (Powell, J., concurring).
29. Id. at 
30. Id. at 689 (Stevens, J., joined by Brennan, Marshall, and Blackmun, JJ., concurring).
31. Id. at 690. The dissenters also noted that "[d]eliberate misconduct generally must be inferred
from the objective evidence. The more egregious the prosecutorial error, and the harsher its impact on
the defendant, the more readily the inference could be drawn." Id. n. 29. 
32. See Hart v. State, 634 S.W.2d 714, 716 (Tex. Crim. App. 1982) (noting Kennedy with
approval and stating that "[t]he unrebutted testimony of the prosecutor on the second trial conclusively
shows the prosecutor did not intend his conduct to provoke the appellant into moving for a mistrial";
finding that prosecutor's failure to comply with pretrial discovery order was a mere oversight because
of overloaded docket and the "great excitement" of arguing a case), overruled on other grounds by
Cane v. State, 698 S.W.2d 138 (Tex. Crim. App. 1985); Anderson v. State, 635 S.W.2d 722, 726,
730-31 (Tex. Crim. App. 1982) (rejecting defendant's contention that the State "intended to cause a
mistrial" by "the direct overreaching and unacceptable conduct of the prosecution"; dissenters apply
Kennedy standards and reasoning in addressing "whether, by deliberately asking the question forming
the basis for the mistrial, the prosecutors intended to provoke the accused into requesting that result");
Collins v. State, 640 S.W.2d 288, 290 (Tex. Crim. App. 1982) (stating that "[a]lthough the opinion of
the [trial] court did not cite Oregon v. Kennedy, this court recently held that the same standard will be
applied in Texas to cases involving a plea of former jeopardy after the defendant asked for a mistrial";
noting that "the determination of the intent of the prosecutor is a factual question to be decided by the
trier of fact" and reversing conviction because the jury, as factfinder, was not given the question);
Crawford v. State, 703 S.W.2d 655, 661 (Tex. Crim. App. 1986) (relying on Kennedy as standard
for double jeopardy after mistrial and concluding that "[b]ecause there was no evidence of intent to
provoke appellant into moving for a mistrial, there was no fact issue to present to the jury, and the trial
court correctly overruled both the plea of former jeopardy and appellant's request to submit the issue to
the jury"). Texas intermediate courts had also applied the Kennedy standard to double jeopardy
claims in the mistrial situation. See, e.g., Mahavier v. State, 644 S.W.2d 129 (Tex. App. - San
Antonio 1982, no pet.) (relying on Kennedy in finding no double jeopardy bar to retrial because no
evidence that prosecutor intended to provoke defendant into requesting mistrial); Collins v. State, 672
S.W.2d 588, 598 (Tex. App. - Fort Worth 1984, no pet.) (applying Kennedy double jeopardy
standard to situation in which trial court denies mistrial motion but that denial is reversed because of
prosecutorial misconduct); Fielder v. State, 683 S.W.2d 565, 568 (Tex. App. - Fort Worth 1985)
(applying Kennedy as "controlling authority" to double jeopardy claim in context of defense-requested
mistrial), rev'd on other grounds, 756 S.W.2d 309 (Tex. Crim. App. 1988); Ex parte May, 852
S.W.2d 3, 4-6 (Tex. App. - Dallas 1993, pet. ref'd) (holding that Kennedy standard applies to double
jeopardy claims brought under both Texas and United States Constitutions and holding that only when
the prosecutor intends to goad the defendant into moving for a mistrial will retrial be barred);
Creekmore v. State, 860 S.W.2d 880, 890-92 (Tex. App.- San Antonio 1993, pet. ref'd) (stating
that "Texas cases interpreting article I, section 14 of the Texas Constitution are consistent with Oregon
v. Kennedy"); Demouchete v. State, 734 S.W.2d 144, 146 (Tex. App.-Houston [1st Dist.] 1987, no
pet.) (applying Kennedy standard to double jeopardy claim under Texas Constitution).
33. 921 S.W.2d 696 (Tex. Crim. App. 1996).
34. Id. at 698 (stating that "[t]he Texas Double Jeopardy Clause, like its federal counterpart, is
meant to restrain the government from subjecting persons accused of crimes to the mental, emotional,
and financial hardship of repeated trials for the same offense").
35. Id. at 699. We stated:

 [W]hen the government, acting through its representatives, purposefully forces
termination of a trial in order to repeat it later under more favorable conditions, we
agree with the Supreme Court that the Double Jeopardy Clause is violated. But, unlike
the Supreme Court, we do not think the prosecutor's specific intent is a relevant aspect
of the inquiry.

Id. at 698-99.
36. Id. at 699.
37. Id. We explained that making the defendant's right against double jeopardy dependent
entirely upon the prosecutor's specific intent to provoke a mistrial does not serve the purpose of that
constitutional right. Id. The distinction between a person's "intent" to cause a mistrial and his
awareness or knowledge that his conduct "would require a mistrial at the defendant's request" is one
that applies to motive or ultimate goal. In the first, the prosecutor's goal is to terminate a first trial which
is going badly. In the second, the prosecutor's goal is to "win at any price," either by mistrial and a
subsequent retrial, or by using manifestly improper means to obtain a conviction in the first trial that he
likely would not have been achieved otherwise and the prosecutor is aware that his conduct requires a
mistrial if the defendant should request it. Id.
38. Id. We noted that, although subjective intent is an important issue in a wide variety of
contexts, "[g]auging the subjective intent of a prosecutor is not an easy thing to do." Id. 
39. Judge Meyers' majority opinion in Bauder defined the type of prosecutorial "recklessness"
required in this context according to the usual Penal Code definition of the culpable mental state of
recklessness, i.e., as being "aware but consciously disregard[ing] the risk that an objectionable event
for which [the prosecutor] was responsible would require a mistrial at the defendant's request. Id. at
699; see also id. at 702 (Maloney, J., concurring); see generally Tex. Penal Code § 6.03(c).
40. Bauder, 921 S.W.2d at 700.
41. See Kennedy, 456 U.S. at 674 ("[e]very act on the part of a rational prosecutor during a trial
is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding
of his guilt"); United States v. Taylor, 54 F.3d 967, 976-77 (1st Cir. 1995) ("prosecutors need not
pull their punches; they may- indeed, they should- present their cases to criminal juries zealously. 
Forcefulness in the pursuit of justice is to be admired rather than condemned"); United States v.
Wexler, 79 F.2d 526, 529-30 (2d Cir. 1935) (L. Hand, J.) ("[i]t is impossible to expect that a criminal
trial shall be conducted without some show of feeling; the stakes are high, and the participants are
inevitably charged with emotion. Courts make no such demand; they recognize that a jury inevitably
catches this mood").
42. Bauder, 921 S.W.2d at 700.
43. Id.
44. 974 S.W.2d 729 (Tex. Crim. App. 1998).
45. Bauder v. State, 974 S.W.2d 729, 731-32 (Tex. Crim. App. 1998). This Court in Bauder
I had explicitly stated: 

 Under this rule, the prosecutor is not accountable for mistrials when the trial judge need
not have granted the defendant's motion. But he is accountable for mistrials properly
granted by the trial judge when the events making a mistrial necessary were of his own
deliberate or reckless doing.

921 S.W.2d at 699. While the issue of whether the trial court correctly granted a mistrial is not
directly the issue in a double jeopardy claim, the fact that a mistrial is not an obvious necessity is
nonetheless highly relevant to a consideration of the prosecutor's mental state in pursuing his line of
inquiry or other conduct. If an appellate court doubts that a mistrial was "required" by the prosecutor's
actions, then it may be reasonable to conclude that the prosecutor was not consciously aware of the
likelihood that his conduct would require a mistrial.
46. See Kennedy, 456 U.S. at 673 (explaining that the "intentional goading" standard was
designed to protect a defendant whose motion for mistrial could not fairly be considered a result of his
own free will; "[i]n such a case, the defendant's valued right to complete his trial before the first jury
would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the
bar of double jeopardy in all circumstances"); Bauder I, 921 S.W.2d at 698 (stating that "when a
prosecutor's deliberate or reckless conduct renders the trial before the jury unfair to such a degree that
no judicial admonishment can cure it, an ensuing motion for mistrial by the defendant cannot fairly be
described as the result of his free election").
47. Bauder II, 974 S.W.2d at 732 (quoting Bauder I, 921 S.W.2d at 700).
48. Id. 
49. Id.
50. 15 S.W.3d 921 (Tex. Crim. App. 2000).
51. State v. Lee, 15 S.W.3d 921, 922 n.1 (Tex. Crim. App. 2000).
52. Id. at 923 (quoting Bauder II, 974 S.W.2d at 732).
53. Id. at 924.
54. Id. at 924-25.
55. Prosecutorial misconduct reasonably reaches only that conduct which is qualitatively more
serious than simple error and connotes an intentional flouting of known rules or laws. See, e.g.,
Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1973) (noting the distinction between "ordinary
trial error of a prosecutor" and "egregious misconduct"); John Jay Douglass, Ethical Issues in
Prosecution 341 (1988) ("[a] violation of a rule of evidence is not ipse dixit unprofessional conduct
unless it was a deliberate attempt to avoid the rule. Motive and intent play a role in determining
whether the action of the prosecutor is unprofessional"); Bruce A. Green, The Ethical Prosecutor
and the Adversary System, 24 Crim. L. Bull. 126, 138 (1988) ("[t]he term 'misconduct' has
pejorative overtones-it suggests that the prosecutor has acted erroneously with intent if not with
malice"; suggesting that "the term 'misconduct' should be reserved for behavior that intentionally
deviates from reasonably attainable standards of propriety").

 If the prosecutor's conduct, viewed objectively, was not "manifestly improper," then the double
jeopardy inquiry ends at this first stage. If, for example, the law itself is unsettled or the application of
the law in the particular situation is debatable, the prosecutor's conduct cannot be said to be manifestly
improper. See Lee, 15 S.W.3d at 924-25.
56. As this Court noted in Lee:

 [v]iolations of evidentiary rules and provisions are generally curable with an instruction
to disregard. Bauder did not change this rule. It would be extremely rare that
admission of evidence in violation of a statute [or evidentiary rule] would be "so
emotionally inflammatory that curative instructions are not likely to prevent the jury
being unfairly prejudiced against the defendant," in the absence of a constitutional
violation.

Lee, 15 S.W.3d at 926 n.8 (citations omitted).
57. If the jury's guilty verdict is significantly influenced by a prosecutor asking legally improper
and prejudicial questions, offering inadmissible evidence, or making improper remarks to the jury, that
verdict will be reversed on appeal regardless of whether the prosecutor intentionally or recklessly
struck a foul blow. As one court put it, "it hurts the defendant just as much to have prejudicial blasts
come from the trumpet of the angel Gabriel." United States v. Nettl, 121 F.2d 927, 930 (3d Cir.
1941). Double jeopardy does not bar retrial when the misconduct, causing a reversal or a mistrial, is
committed by the inadvertent Gabriel; double jeopardy bars retrial only when caused by the intentional
or reckless misconduct by a consciously aware Beelzebub.
58. Beringer v. Sheahan, 934 F.2d 110, 113 (7th Cir. 1991).
59. See, e.g., United States v. Etsitty, 130 F.3d 420, 424 (9th Cir. 1997) (holding that
prosecutor's mischaracterization of identification evidence in summation was no reason to believe that
the prosecutor intended to mislead the jury); United States v. Millar, 79 F.3d 338, 343 (2d Cir.
1996) (noting that a reference to an exhibit not admitted in evidence was unintentional and harmless
oversight); United States v. Wihbey, 75 F.3d 761, 770 (1st Cir. 1996) (describing a reference to
defendant's failure to testify as a slip of the tongue).
60. Ex parte Kimes, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (defendant-applicant
bears the burden of proof at a habeas hearing to show a constitutional violation); see also Ex parte
Thomas, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995) ("[t]he burden of proof in a writ of habeas
corpus is on the applicant to prove by a preponderance of the evidence his factual allegations"); Ex
parte Adams, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1989).
61. See Anderson v. State, 635 S.W.2d 722, 725 (Tex. Crim. App. 1982); Wockenfuss v.
State, 521 S.W.2d 630, 631 (Tex. Crim. App. 1975) (defendant has burden to go forward with
evidence in support of his double jeopardy allegation).
62. Sims v. State, 99 S.W.3d 600, 604 (Tex. Crim. App. 2003) (stating that, when rejecting a
defendant's factual sufficiency claim, TRAP 47.1 "suggests that the courts of appeals should 'show
their work,' much as we had to when learning long division in elementary school").
63. A prosecutor may try to rescue a case that is going badly by goading a mistrial or consciously
risking one with manifestly improper methods, but "[s]cuttling a trial at dockside poses few if any risks
to the defendant's legitimate interests." United States v. Jozwiak, 954 F.2d 458, 460 (7th Cir. 1992).
64. See Lee, 15 S.W.3d at 926.
65. See, e.g., Donnelly v. DeChristoforo, 416 U.S. 637, 645-47 (1974) (acknowledging that
prosecutor's remark during closing argument was "admittedly an ambiguous one"; although it might
have been intended to convey its most prejudicial meaning, there were other, less damaging
interpretations; when conflicting interpretations are present, "a court should not lightly infer that a
prosecutor intends an ambiguous remark to have its most damaging meaning"); United States v.
Neufeld, 949 F. Supp. 555, 560-61 (S.D. Ohio 1996) (noting that even though the government's
stance on admissibility of "homosexual lover" evidence "was ultimately found unpersuasive does not
render it wholly implausible or an attempt to goad a mistrial.... Hence, the Court must be cautious in
labeling courtroom conduct as an intent 'to subvert the protections afforded by the Double Jeopardy
Clause'"), aff'd, 149 F.3d 1185 (6th Cir. 1998).
66. See, e.g., Neufeld, 949 F. Supp. at 561 ("[v]iewed through the filter of the prosecutor's
subjective belief, many of the facts upon which defendants rely to indicate an intent to provoke a
mistrial instead become further evidence of the strength of the prosecutor's belief. His actions show
considerable consistency").
67. In reviewing a trial judge's decision to grant or deny relief on a writ of habeas corpus, we
afford almost total deference to a trial judge's determination of the historical facts supported by the
record, especially when the fact findings are based on an evaluation of credibility and demeanor. See
Ex parte Martin, 6 S.W.3d 524, 526 (Tex. Crim. App. 1999). However, if the trial court's ruling is
not supported by the record, this Court may make contrary findings. See Ex parte Adams, 768
S.W.2d 281, 288 (Tex. Crim. App. 1989) ("[i]f the record will not support the trial judge's
conclusions, then this Court may make contrary findings").
68. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial court may accept
or reject any or all of any witness's testimony. See Alvarado v. State, 853 S.W.2d 17, 23 (Tex. Crim.
App. 1993); Allridge v. State, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991). In any habeas corpus
hearing, a trial court may enter oral or written findings of fact. This practice is especially helpful if the
trial court rejects unrebutted testimony as incredible or unworthy of belief.
69. Guzman, 955 S.W.2d at 89.
70. Id.
71. Ex parte Peterson, slip op. at 7 (*12).
72. Id. at 7-8 (*5).
73. Id. at 8 (*12).